IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RICHARD D. JACKSON, LORETTA S.      *
JACKSON, and E.D.J., *a minor*
*child, by and through her*          *
*parents* RICHARD D. JACKSON *and*
LORETTA S. JACKSON,                  *

    Plaintiffs,                  *

vs.                                  *      CASE NO. 4:17-CV-17 (CDL)

DAVID McCURRY, *in his*              *
*individual and official*
*capacities*, and SANDI D. VELIZ,    *
BO OATES, JOSH KEMP, and RYAN
SMITH, *in their individual*         *
*capacities*,
                                       *

    Defendants.
_____

O R D E R

    This case began when two administrators at Chattahoochee County Middle High School ("CCMHS") searched a student's cell phone without a warrant during their investigation of alleged threats made against the student. The matter escalated when the student's father, who was upset by the search of his daughter's cell phone, allegedly threatened school officials. Based upon those threats, the school superintendent informed the student's father that his communication with school employees and access to school property would be significantly restricted. And in fact, the father was forcibly removed from school grounds on one occasion. The superintendent also prevented the father from

voicing his grievances at a meeting of the school board after the father threatened litigation.

Based on these events, the student's father and mother, individually and on behalf of their daughter, sued the school superintendent in his individual and official capacities, claiming that he violated their First Amendment rights by restricting their communications with school officials. They also assert claims against the school district employees who searched their daughter's cell phone and who removed the father from a school event, alleging that these employees are liable in their individual capacities for violating the father's and his daughter's Fourth Amendment rights. Plaintiffs also allege state-law claims arising from this same conduct.

As explained in the remainder of this Order, all defendants are entitled to qualified immunity for the federal law claims asserted against them in their individual capacities. Furthermore, the Court finds that Defendants are entitled to official immunity under Georgia law as to Plaintiffs' state law claims. Accordingly, Defendants' motions for summary judgment (ECF Nos. 17 & 19) are granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit under the substantive law the Court is applying. *Id.* at 248; *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts. EDJ was a twelfth grade student at CCMHS during the 2016-17 school year. In August of 2016, rumors circulated around the school that EDJ was bad-talking another student, *M*.[1] As is to be expected, those rumors eventually made it back to *M*, who became upset with EDJ and threatened her. After school that day, EDJ told school officials about *M*'s threat.

---

[1] Because the Court finds it unnecessary to refer to certain non-parties, who were likely minors when the underlying events occurred, by their full names, several individuals are identified throughout this Order using only initials.

## I.  Kemp & Oates Investigate the Situation

The next day, Josh Kemp, an administrative assistant to CCMHS assistant principal Bo Oates and principal Sandi Veliz, was notified that *M* threatened EDJ.  He began gathering information about the incident from *M* and two other students, *B* and *A.*  Kemp. Dep. 22:15–17, 24:24–25:9, ECF No. 26.   *M* told Kemp that EDJ had been making fun of her for not making the volleyball team.  *Id.* at 25:12–14.  *A* told Kemp that EDJ had been making fun of *M* as well, and *B* told Kemp that EDJ had been sending text messages to other students about *M.*  *Id.* at 25:24–26:25.  The text messages were reportedly sent from EDJ to *A* and *B.*  *Id*. at 28:2–5, 39:7–11.  At some point, Kemp informed Oates of the situation between *M* and EDJ.  Oates Dep. 17:5–10, ECF No. 27.

After completing his interviews of the other students, Kemp called EDJ to his office to get her side of the story.  Kemp Dep. 29:11–13.  Oates was also present during EDJ's interview.  Kemp and Oates questioned EDJ about whether she had been sending messages to students about *M* as the other students had alleged.  *Id.* at 33:14–18; *accord* EDJ Dep. 25:15–24, ECF No. 23.  EDJ denied talking about *M.*  EDJ claims that Oates then told her to unlock her phone and give it to him so that he could see if EDJ had been sending messages about *M.*  EDJ Dep. 26:6–14, 40:16; EDJ Aff. ¶ 2, ECF No. 34.  She claims that she did not give Oates

permission to search her phone. After Oates reviewed her
messages with *B*, Oates continued to review messages from EDJ's
family members, best friend, and ex-boyfriend. EDJ Dep. 28:5–
10; EDJ Aff. ¶ 2.[2] Oates made some remarks about the messages he
reviewed, told Kemp that he did not see where EDJ had done
anything wrong, and gave the phone back to her.

Later that evening, EDJ told her father, Richard D.
Jackson, about what happened that day.

## II. Mr. Jackson's Objections & the School's Response

Over the next couple of days, Mr. Jackson repeatedly called
David McCurry, the superintendent of the Chattahoochee County
School District. McCurry Dep. Ex. 1, Call Receipts (August 17,
18, & 19, 2016), ECF No. 24-1 at 1. In one call, Mr. Jackson
threatened to sue the school for violating EDJ's constitutional
rights. McCurry Dep. 43:11–23, ECF No. 24. In another, he
inquired as to whether he could speak to the school board. *Id.*
at 44:19–45:2. McCurry told him that he could neither attend
nor speak at the school board meeting because he had threatened
litigation. R. Jackson Dep. 47:12–48:10, ECF No. 21.

---

[2] Oates and Kemp testified that they asked EDJ if they could see her
phone and that she consented. Kemp Dep. 33:25–34:8; Oates Dep. 21:12–
15. Oates also contends that he only reviewed messages to and from
other students and that he would not have reviewed any messages
between her family or boyfriend. Oates Dep. 21:20–24, 22:7–14.
Nonetheless, the Court must accept EDJ's version of the events for
purposes of this Order.

Additionally, Mr. Jackson called principal Veliz and assistant principal Oates about the incident. Veliz Dep. 38:22–39:5, ECF No. 25; Oates Dep. 33:5–8. Mr. Jackson also went to CCMHS during volleyball practice to speak with EDJ's volleyball coaches about the incident. After that meeting, the coaches immediately reported orally to McCurry and Veliz that Mr. Jackson acted aggressively during the meeting with them and that he threatened Oates's safety. McCurry Dep. 36:7–12, 37:16–25. The coaches reduced their statements to writing. Veliz Dep. 49:10–17. Mr. Jackson denies that he acted aggressively or made any threats against Oates, which the Court must accept as true for purposes of this Order.

Although there is some dispute as to what actually happened during the meeting between Mr. Jackson and the coaches, there is no dispute about what McCurry, based on his conversation with the coaches and the coaches' written statements, *believed* happened during that meeting. McCurry learned from the coaches that Mr. Jackson inquired about the identity of certain students and that he was aggressive towards the coaches. McCurry also determined that Mr. Jackson told the coaches that he would come to CCMHS to show Oates "what intimidation was," which McCurry interpreted as a threat to Oates. McCurry Dep. 37:9–25; *see also* Veliz Dep. Exs. 3 & 4, Written Statements of Volleyball Coaches, ECF No. 25-1 at 3–6 (describing coaches' versions of

the meeting).[3]  McCurry believed Mr. Jackson posed a threat to the safety of his employees and students.  McCurry Dep. 58:8-9. Ryan Smith, a deputy sheriff and the school resource officer, reviewed video footage of Mr. Jackson's meeting with the coaches.  Smith Dep. 50:14-18, ECF No. 28.

A couple of days later, Mr. Jackson returned to CCMHS to speak with Veliz.  Based on what he heard from the volleyball coaches, McCurry believed that Mr. Jackson intended to confront Oates, so he met Mr. Jackson at the front door of the school and prohibited him from entering.  McCurry Dep. 53:17-24.  McCurry instructed Mr. Jackson not to have any further communication with school officials or students and told him to direct all future communications to the school board's attorney.  *Id.* at 54:4-13.  McCurry asked Ryan Smith, the school resource officer and a deputy sheriff, to stand by while he confronted Mr. Jackson.  Smith observed the encounter from inside the door. Smith Dep. 29:12-16.  When McCurry came back inside the school, McCurry advised Smith that he informed Mr. Jackson that he was not allowed back on school premises.  McCurry then directed

---

[3] McCurry reviewed the coaches' statements.  McCurry Dep. 39:21-23. The statements are evidence of the information McCurry had about the meeting, not what actually transpired at the meeting, and thus they are not hearsay.  *See* Fed. R. Evid. 801(c)(2) (defining hearsay as a statement that is offered "to prove the truth of the matter asserted in the statement").

Smith to remove or arrest Mr. Jackson if Smith saw him on school property. *Id.* at 29:17–21.[4]

McCurry also sent Mr. Jackson a letter. The letter recited what McCurry believed happened during Mr. Jackson's meeting with EDJ's volleyball coaches and stated that the school district "has determined your conduct in this regard is disruptive and contrary to the establishment of a healthy educational environment for the students of our school system." McCurry Dep. Ex. 3, Letter from D. McCurry to R. Jackson (Aug. 26, 2016) 1, ECF No. 24-1 at 4–5 [hereinafter "McCurry Letter"]. The letter further barred Mr. Jackson from making any unauthorized appearance at CCMHS or any extracurricular activity conducted by school officials where students are present. The letter provided two exceptions—he was permitted to pick EDJ up or drop her off at school, *id.*, and he could attend EDJ's volleyball games, as long as he stayed in the designated area for parents, *id.* at 2.

---

[4] Neither Smith's testimony about what he perceived from the video footage nor his testimony about what McCurry told him following McCurry's conversation with Mr. Jackson are hearsay. *See United States v. McKenzie*, 505 F. App'x 843, 845 (11th Cir. 2013) (per curiam) (finding detective's testimony about what he saw on video, as opposed to what he heard on the video, was not hearsay); *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986) (finding declarant's out-of-court directive to another to be a non-assertive verbal statement and, thus, not hearsay); Fed. R. Evid. 803(1) (excluding statements describing an event made immediately after the declarant perceived it from the rule against hearsay).

### III. Mr. Jackson's Removal from Senior Night

About a month later, Mr. and Mrs. Jackson attended a volleyball game at CCMHS. It was senior night for the girls on the volleyball team, including EDJ. Kemp and Smith were also in attendance. Kemp and Smith noticed that Mr. Jackson was present at the game, and Smith reminded Kemp that Mr. Jackson was not supposed to be on school premises. Kemp Dep. 51:17–25. Kemp then made a telephone call to Veliz concerning Mr. Jackson's presence at the school, and he told Veliz that Mr. Jackson was not supposed to be there. Veliz then called McCurry, who told Veliz that they could remove Mr. Jackson if they felt it was necessary and that he would back-up their decision. Veliz Dep. 58:20–22; McCurry Dep. 63:3–12. Veliz told Kemp to remove Mr. Jackson from the gymnasium after the senior night activities concluded. Veliz Dep. 59:11–13. Veliz did not ask Kemp to involve Smith with Mr. Jackson's removal. *Id.* at 68:19–22. As of that time, neither Veliz, nor Kemp, nor Smith had read the letter from McCurry to Mr. Jackson that permitted him to attend his daughter's volleyball games.

What happened next is in dispute. Smith and Kemp approached the bleachers where Mr. Jackson was sitting and summoned Mr. Jackson. Mr. Jackson contends that when he approached Smith, Smith firmly grabbed his arm, placed his other hand on his pistol, and walked Mr. Jackson to the concession

area. R. Jackson Dep. 54:18-25, 70:22-23, 72:8-12. Though Smith contends that he never touched Mr. Jackson, the Court must accept Plaintiffs' version of the facts for purposes of this Order. Kemp followed Smith and Mr. Jackson. When they reached the concession area, Smith told Mr. Jackson that he needed to leave. Mr. Jackson responded that McCurry had sent him a letter that expressly allowed him to attend his daughter's volleyball games. *Id.* at 73:9-21. Smith asked whether Mr. Jackson had the letter with him, and when Mr. Jackson said he did not, Smith told Mr. Jackson that he needed to leave. *Id.*; Smith Dep. 34:17-35:8. Smith confirmed with Kemp that Mr. Jackson should be removed. Smith Dep. 41:13-15. Smith then explained to Mr. Jackson that he could be arrested for criminal trespass if he attempted to stay on the premises after being asked to leave by school officials. *Id.* at 42:3-18. Smith then grabbed Mr. Jackson's arm again and escorted him outside the gym. R. Jackson Dep. 104:3-5. Afterwards, Veliz instructed Kemp to retrieve from her office a copy of the letter McCurry wrote to Mr. Jackson and to read it to her. They then realized that Mr. Jackson was permitted to attend the games and that his removal was a mistake.

## DISCUSSION

Plaintiffs assert the following federal claims pursuant to 42 U.S.C. § 1983 based on the alleged violation of their federal

constitutional rights: (1) a Fourth Amendment claim against Oates in his individual capacity arising from his search of EDJ's phone; (2) a Fourth Amendment claim against Smith in his individual capacity arising from his removal of Mr. Jackson from school premises during the volleyball game; (3) a Fourth Amendment claim against Veliz in her individual capacity based on her participation in Mr. Jackson's removal from the volleyball game; (4) a Fourth Amendment claim against Kemp in his individual capacity based on his participation in Mr. Jackson's removal from the volleyball game; (5) a First Amendment claim against McCurry in his individual and official capacities for restricting Mr. Jackson's communications with school personnel and access to school property; and (6) a First Amendment claim against McCurry in his individual and official capacities for preventing Mr. Jackson from addressing the school board. Plaintiffs also assert state-law claims against the Defendants. Plaintiffs did not respond to Defendants' summary judgment motion as to their official capacity claims against McCurry, so those claims are deemed abandoned. *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (en banc).

## I.  Plaintiffs' Federal Claims

Defendants contend that they are entitled to qualified immunity as to Plaintiffs' claims against them in their

individual capacities.  Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a government official shows that they were acting within the scope of their discretionary authority, "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).  Plaintiffs do not challenge that Defendants acted within their discretionary authority when they committed the challenged actions.  Thus, Plaintiffs must show that, under their version of the facts, Defendants are not entitled to qualified immunity.

To overcome a qualified immunity defense, Plaintiffs must show both (1) that the relevant defendant violated their constitutional rights and (2) that those rights were clearly established at the time of the violation. *Id.*  To determine whether a right was clearly established, the Court must look to cases from the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court, that were handed down before the alleged

violation occurred. *Id.* at 1209.[5] Plaintiffs are not required to identify "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). Plaintiffs may do this in three ways: First, Plaintiffs "'may show that a materially similar case has already been decided'"; second, Plaintiffs may show that this is a case of "obvious clarity" by pointing "'to a broader, clearly established principle that should control the novel facts of the situation'"; or, third, by showing that Defendants' conduct "'so obviously violate[d] the constitution that prior case law is unnecessary.'" *Wardynski*, 871 F.3d at 1208 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012)).

A.   Fourth Amendment Claims

The Fourth Amendment "prohibits unreasonable searches and seizures by state officers." *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (quoting *Elkins v. United States*, 364 U.S. 206, 213 (1960)); *accord* U.S. Const. amend. IV. Plaintiffs claim that Oates violated EDJ's Fourth Amendment rights when he took her cell phone, directed her to give him access to its contents, and looked through her text messages from friends and family.

---

[5] Accordingly, the Court does not address the cases from other circuits and district courts that Plaintiffs submitted to carry their burden of showing that Defendants violated clearly established law.

Mr. Jackson claims that Smith, Veliz, and Kemp violated his Fourth Amendment rights when they removed him from the volleyball game.

   1.   *EDJ's Search & Seizure Claim*

The Supreme Court has articulated the Fourth Amendment standard for student searches in the school setting as follows:

> The Fourth Amendment . . . generally requires a law enforcement officer to have probable cause for conducting a search. "Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," and that evidence bearing on that offense will be found in the place to be searched.
>
> In *T.L.O,* we recognized that the school setting "requires some modification of the level of suspicion of illicit activity needed to justify a search," and held that for searches by school officials "a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause[.]"  We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student, and have held that a school search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction[.]"

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (first three alterations in original) (internal citations omitted) (first quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949); then quoting *T.L.O.*, 469 U.S. at 340; and then quoting *T.L.O.*, 469 U.S. at 341); *see also Ziegler v. Martin*

*Cty. Sch. Dist.*, 831 F.3d 1309, 1319 (11th Cir. 2016) (explaining that the legality of such a search depends "simply on the reasonableness, *under all the circumstances*, of the search" (quoting *T.L.O.*, 469 U.S. at 341)).

Whether a search involving students is reasonable depends on both "(1) 'whether the action was justified at its inception,' and (2) 'whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Ziegler*, 831 F.3d at 1319 (quoting *T.L.O.*, 469 U.S. at 341). Such a search will be "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating . . . the rules of the school." *Id.* (quoting *T.L.O.*, 469 U.S. at 341–42).

To overcome Oates's qualified immunity defense, Plaintiffs must prove that it was clearly established at the time of Oates's search of EDJ's phone that such a search would violate the Fourth Amendment. While *T.L.O.* clearly established the general standard for the search of a student, Plaintiffs pointed the Court to no decision by the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court addressing the constitutionality of a search of a student's cell phone, much less one with materially similar circumstances as those present here. Moreover, the Court does not find that it would have been

clearly obvious to a school official in Oates's circumstances that the Fourth Amendment prevented him from conducting the search of EDJ's phone as he did. Pretermitting whether the search violated the Fourth Amendment, it is clear that Oates is entitled to qualified immunity as to this claim.

When viewed in the light most favorable to EDJ, the facts show that Oates searched her phone because he believed she was sending negative messages about *M* to other students. His belief was based on the information he received from Kemp, who interviewed two students and learned that EDJ had been making fun of *M* and sending text messages about *M* to other students. *Cf. C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 388 (11th Cir. 1996) (explaining that administrators are entitled to rely on direct tips from students because the informing students face disciplinary repercussions if the tip is misleading). Oates testified that this conduct could constitute harassment, which is prohibited by the student code of conduct. Oates Dep. 29:9–10; *see* McCurry Dep. Ex. 6, Student Handbook, ECF No. 24-1 at 65 ("No student shall engage in verbal or written harassment, threat or abuse of, or towards, another student or students."). Therefore, Oates and Kemp had reasonable grounds to suspect that a search of the text messages on EDJ's cell phone would reveal evidence that she was violating or had violated the school's rule against harassment.

The next question is whether it would have been clear to a reasonable school official that the search as conducted was unreasonably intrusive given EDJ's age, sex, and the nature of the infraction. EDJ was a senior and therefore presumably among the most mature students in the school based upon her age. Her sex is irrelevant to the search of the cell phone, and the Court cannot conclude that the alleged infraction was insignificant. The only part of the search that was arguably suspect was Oates's alleged viewing of messages to and from family members and other persons not associated with the alleged incident under investigation. But a reasonable school official under these circumstances may have concluded that expanding the search to relatives and others was warranted. EDJ had to identify for Oates the recipients of some of her messages because the recipients were identified with "emojis" instead of their names. EDJ Dep. 26:14-17, 31:10-13. Because Oates knew that EDJ could label her contacts in any manner she chose, he could reasonably assume that EDJ could disguise her contacts and any messages from them. Thus, messages that *purported to be* between EDJ and her family members could *actually be* between EDJ and other students. Therefore, a review of those messages could still be reasonably related to potentially finding harassing messages sent to other students. *Cf. United States v. Adjani*, 452 F.3d 1140, 1150 (9th Cir. 2006) (explaining that "[t]he government

should not be required to trust the suspect's self-labeling" because computer files are easy to disguise or rename). At a minimum, it would not have been clear to a reasonable school official that such a search would violate the student's Fourth Amendment rights.

The Court rejects Plaintiffs' contention that the Supreme Court's decision in *Riley v. California*, 134 S. Ct. 2473 (2014), made it clear to all school officials that they will violate the Fourth Amendment if they search a student's cell phone without a warrant. In *Riley*, the Supreme Court recognized the private nature of the data people now store on their cell phones in holding that officers may not categorically conduct warrantless searches of data on arrestees' cell phones. *See id.* at 2490 (noting that many cell phone users keep "a digital record of nearly every aspect of their lives—from the mundane to the intimate"). But the Court's holding in *T.L.O.*, that school officials did not need a warrant to search students suspected of violating a school rule or the law, was based, at least in part, on the needs of the *environment* in which the search is conducted, *i.e.* the school setting. *See T.L.O.*, 469 U.S. at 340 (explaining that the warrant requirement is unsuited to the school environment). Further, *T.L.O.* specifically contemplated searches of "highly personal items [such] as photographs, letters, and diaries" that students carried to school. *Id.* at

339.    Though technology has changed since *T.L.O.* was handed down, a school official's search of a student's cell phone on school property and during the school day still fits within the framework announced in *T.L.O.* Moreover, the Court in *Riley* did not suggest in any way that *Riley* would apply to searches of students by school officials; nor did the Court in *Riley* overrule *T.L.O*, and it is certainly not this Court's prerogative to do so.    The Court finds that the holdings of *T.L.O.* and *Riley* are not "so clear and broad" that "every objectively reasonable government official" facing the circumstances presented here would know that conducting the search as Oates did would be illegal.    Accordingly, Oates is entitled to qualified immunity on Plaintiffs' Fourth Amendment claim arising from the search of EDJ's phone.

### 2.    Mr. Jackson's Seizure Claim

Mr. Jackson contends that Smith, Veliz, and Kemp violated his Fourth Amendment rights when Smith forcibly removed him from the volleyball game at the direction of Kemp and Veliz. Defendants argue that they are entitled to qualified immunity because they had a reasonable suspicion that Mr. Jackson was committing criminal trespass under Georgia law.[6]

---

[6] Under Georgia law, "[a] person commits the offense of criminal trespass when he or she knowingly and without authority . . . [e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner

Viewed in the light most favorable to Mr. Jackson, the evidence shows that when Mr. Jackson went to CCMHS to speak with Veliz after Oates and Kemp searched EDJ's cell phone, McCurry met Mr. Jackson at the front door while Smith stood inside watching the encounter. After McCurry finished speaking with Mr. Jackson, McCurry advised Smith that Mr. Jackson was not allowed on school premises and informed Smith that he had warned Mr. Jackson that he was not allowed on school premises. Smith Dep. 29:12-22, 31:2-7. Thus, on the night Mr. Jackson attended the volleyball game, Smith had personal knowledge that Mr. Jackson had previously been warned that he was not permitted on school premises. Further, before Smith initially "seized" Mr. Jackson, Kemp, in the presence of Smith, called principal Veliz, who confirmed that Mr. Jackson was not permitted on school premises.[7] Kemp then confirmed to Smith that they should remove Mr. Jackson. Smith Dep. 32:9-17. Based on the above evidence, Smith had enough information to support a reasonable suspicion that Mr. Jackson was criminally trespassing on school property. *See, e.g.*, *Patterson v. State*, 559 S.E.2d 472, 475 (Ga. 2002) (finding *probable cause* to arrest suspect of criminal trespass where officer knew that suspect had been warned not to return to

---

or rightful occupant that such entry is forbidden[.]" O.C.G.A. § 16-7-21.
[7] For purposes of this Order, the Court assumes without deciding that Mr. Jackson's detention was a Fourth Amendment seizure.

the property and had returned to the property anyway).[8]  Thus, the Court finds that Mr. Jackson's seizure was justified at its inception.

The Court also rejects Mr. Jackson's contention that the scope of his seizure was unreasonable under clearly established law.  Whether a seizure is an investigatory stop or an arrest, an officer's use of force throughout the seizure must be reasonable.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.* at 396.  "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure."  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).  Under the totality of the circumstances, the Court finds that Smith's use of force in initiating and conducting the seizure of Mr. Jackson was arguably reasonable.

Preliminarily, the Court notes that Mr. Jackson testified that Smith's grip on his arm was not painful and that he was unaware whether it caused him any injury.  R. Jackson Dep.

---

[8] Mr. Jackson makes much of the fact that the letter he received from McCurry expressly sanctioned his presence at volleyball games.  But it is undisputed that neither Smith, nor Kemp, nor Veliz had read the McCurry letter until after Smith seized and removed Mr. Jackson.  *See United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989) (explaining that reasonable suspicion is determined from the collective knowledge of the officers involved in the seizure).

70:22–71:15, 104:13–105:3.  Thus, no reasonable juror could find that Smith's use of force was any more than *de minimis*.  *Cf. Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008) (per curiam) (finding officer used *de minimis* force when he gripped plaintiff's arm to escort him out of hotel and plaintiff testified that the grip did not hurt).  Further, Smith believed that Mr. Jackson had previously been hostile with school officials.  *See* Smith Dep. 29:12–16 (explaining that, when Mr. Jackson went to CCMHS and attempted to speak with Veliz, McCurry asked Smith to stand by "because he was worried what might have happened from the tempers on the phone of Mr. Jackson calling Bo Oates"); *see also Courson v. McMillian*, 939 F.2d 1479, 1495 n.27 (11th Cir. 1991) (explaining that officers may take steps reasonably necessary to protect their safety and maintain the status quo).  Smith used this *de minimis* force to initially effect the seizure of Mr. Jackson, and it was thus reasonably related to Smith's purpose of detaining Mr. Jackson to investigate his presence at the volleyball game.  Smith's continued use of force in escorting Mr. Jackson to the concessions area was also reasonably related to that investigation because Smith wanted to conduct the investigation in a more private area.  *See* Smith Dep. 34:12–14 (explaining that he wanted to question Mr. Jackson elsewhere).  Because Smith released Mr. Jackson once they reached the concessions

area, Smith's use of force was no more than was reasonably necessary to accomplish his purpose. As to Smith's final use of force in escorting Mr. Jackson from the gym, Smith had already instructed Mr. Jackson to leave the premises once and he resisted by arguing that he had the right to be at the volleyball game. Although Mr. Jackson told Smith that he had permission to be on school grounds, it is undisputed that Mr. Jackson did not have the letter from McCurry with him at the volleyball game and that neither Kemp, nor Veliz, nor Smith had read the letter until after Mr. Jackson's removal. And an officer "need not credit everything a suspect tells him." *Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002) (explaining that suspect's statement to officer that he had pre-existing injury did not make officer's use of force unreasonable). Thus, Smith had reasonable suspicion to believe that Mr. Jackson was criminally trespassing, and his use of force was reasonably related to removing Mr. Jackson, who Smith believed had been hostile with school officials and had verbally resisted Smith's request to leave.

Moreover, Mr. Jackson has not identified any applicable case law from which a reasonable official in Smith's position would have known that he would violate the Fourth Amendment by using *de minimis* force to remove a person from public property when that person was suspected of criminally trespassing.

Similarly, Mr. Jackson failed to point to any precedent clearly establishing that Kemp's and Veliz's conduct in connection with the removal would violate the Fourth Amendment. Accordingly, viewing the evidence in the light most favorable to Mr. Jackson, the Court finds that Smith, Veliz, and Kemp are entitled to qualified immunity.

### B. Mr. Jackson's First Amendment Claims

Mr. Jackson contends that McCurry violated his First Amendment rights in two ways—first, by restricting his communication with school employees and, second, by preventing him from presenting his grievances to the school board during its public meeting. Because no reasonable school official would have been reasonably aware that such restrictions violate the First Amendment, McCurry is entitled to qualified immunity as to these claims.

#### 1. The McCurry Letter

Mr. Jackson contends that McCurry's letter was unconstitutionally overbroad because it "set no time limitation [as to] when [Mr.] Jackson could speak to teachers, coaches or students again" and because it failed to specify whether Mr. Jackson was "prohibited from communicating with teachers, coaches, and students outside of school." Pls.' Br. in Resp. to Defs. McCurry et al.'s Mot. for Summ. J. 14, ECF No. 33. In a recent case, the plaintiff parent, while attending a school

24

event, made a hyperbolic statement that a school official should be "shot in the head." *Yates v. Cobb Cty. Sch. Dist.*, 687 F. App'x 866, 867 (11th Cir. 2017) (per curiam). The school resource officer then obtained a warrant for the parent's arrest for disrupting a public school. The plaintiff parent complained that this adverse action violated her First Amendment rights. *Id.* at 867–68. In upholding the district court's finding that the officer and school officials were entitled to qualified immunity, the Eleventh Circuit, in an unpublished opinion, noted that its "own research [did] not reveal[] a case in which the U.S. Supreme Court, the Georgia Supreme Court, or [the Eleventh Circuit] ha[d] addressed the extent to which school officials may limit a parent's private speech while attending a school event." *Id.* at 869. Although the speech McCurry allegedly restricted in this case was Mr. Jackson's speech both on *and off* school property, Mr. Jackson similarly failed to point to any case addressing the extent to which school officials could limit a parent's speech to other school officials and students. And the Court is unconvinced that the restrictions in the letter otherwise violate Plaintiffs' First Amendment rights with obvious clarity. Accordingly, McCurry is entitled to qualified immunity as to this claim.[9]

---

[9] To the extent that Plaintiffs assert a claim for declaratory relief against McCurry in his individual capacity, that claim also fails

*2.    Prohibition on Speaking to the School Board*

McCurry also told Mr. Jackson that he was not allowed to speak at the school board meeting because Mr. Jackson had threatened to sue the school.  R. Jackson Dep. 47:22-24. McCurry is also entitled to qualified immunity on this claim because it was not clearly established that prohibiting a parent from speaking at a school board meeting because the parent had threatened to sue the school and school officials was an illegal restriction on protected speech.  "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs."  *United States v. Frandsen*, 212 F.3d 1231, 1236-37 (11th Cir. 2000).  "Courts use '"forum analysis" to evaluate government restrictions on purely private speech that occurs on government property.'"  *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223-24 (11th Cir. 2017) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015)).  Although the parties agree that the citizen complaint portion of the school board meeting is a designated public forum, the Court finds, instead, that such portion of the school board meetings is a *limited* public forum.

---

because Plaintiffs do not have standing to assert such a claim.  *See Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (requiring a plaintiff to show that the injury the plaintiff has suffered will continue or will be repeated in the future to establish standing for declaratory relief).

A designated public forum is "'government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose.'" *Id.* at 1224 (alteration in original) (quoting *Walker*, 135 S. Ct. at 2250). A limited public forum "'exists where a government has reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Id.* (alteration in original) (quoting *Walker*, 135 S. Ct. at 2250). Here, the school board policy states that it "will consider hearing citizen complaints" and sets up a procedure for obtaining permission to speak at the meeting. McCurry Dep. Ex. 6, CCMHS Student Handbook 2–3, ECF No. 24-1 at 9–10. Because the citizen complaint portion "limits discussion to certain topics and employs a system of selective access," it falls into the category of limited public fora. *Cf. Barrett*, 873 F.3d at 122-25. "Control over access to a [limited public] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).[10] The question, then, is whether McCurry's prohibition on Mr. Jackson speaking at the school board meeting

_____

[10] In *Cornelius*, the Supreme Court used "nonpublic forum" where the Court has altered the sentence to read "limited public forum." *See Cornelius*, 473 U.S. at 806. This is because the Eleventh Circuit has recently recognized that the Supreme Court "has, in the past, used the term 'nonpublic forum' when it should have employed the term 'limited public forum.'" *Barrett*, 872 F.3d at 1226.

was viewpoint neutral and reasonable in light of the purpose served by the citizen complaint portion of the school board meeting.

McCurry's prohibition on Mr. Jackson speaking to the school board did not directly target the content of his speech; rather, it restricted Mr. Jackson's speech at the school board meeting based on his membership in a certain class of potential speakers—those who had sued or threatened to sue the school. *Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983) (construing access policy that permitted the teachers' exclusive bargaining union access to the school mail system but denied access to a rival union as one based on the status of the respective unions and not viewpoint). It is undisputed in this case that McCurry's stated reason for prohibiting Mr. Jackson from speaking to the school board was because Mr. Jackson threatened to sue the school and school officials. As noted above, a school may restrict access to a limited public forum based on the speaker's identity so long as it is reasonable and viewpoint neutral.

McCurry's restriction here was arguably reasonable in light of the purpose served by the citizen complaint portion of the school board meeting. The restriction simply prohibited a person who has sued or threatened to sue the school district from raising complaints to the school board that are the subject

of that litigation. Such a policy prevents a potentially hostile engagement between potential litigants, and it also eliminates the opportunity for one party in pending or potential litigation to gain an advantage based upon discussion at a school board meeting. That does not mean that Mr. Jackson did not have other avenues to voice his grievances, including communicating with the school board attorney (which McCurry told Mr. Jackson to do), corresponding directly with school board members outside of the public meeting, filing a lawsuit, and using the United States mail, which are likely ample alternative channels for his grievances. *See id.* at 54 (explaining that rival union had ample alternative channels to communicate with teachers because it could use bulletin boards, meeting facilities, and the U.S. mail). Given that the citizen complaint portion of the school board meeting is designed to allow the school board an opportunity to resolve issues that administrators have failed to resolve, prohibiting those who have threatened to sue or are suing the school from speaking about the subject of their suits or potential suits is reasonable. Even if such a restriction were not reasonable, however, it was certainly not clearly established at the time McCurry restricted Mr. Jackson's speech that such a restriction was unreasonable.

It is also important that the restriction was viewpoint neutral. "Viewpoint discrimination occurs 'when the specific motivating ideology or opinion or perspective of the speaker is the rationale for the restriction.'" *Barrett*, 873 F.3d at 1225 n.10 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). Although the school district in this case may have disagreed with Mr. Jackson's contention that EDJ's Fourth Amendment rights were violated, there is no evidence in the record from which a reasonable jury could conclude that this was the reason he was not allowed to appear before the Board. Mr. Jackson pointed to no evidence that other speakers had threatened litigation against the school and were nonetheless allowed to speak at the board meetings. Nor did the restriction directly target Mr. Jackson's viewpoint that the school had violated EDJ's Fourth Amendment rights. Regardless of whether the school board agreed with Mr. Jackson that Oates violated EDJ's Fourth Amendment rights by searching her cell phone or not, he was prohibited from speaking on the matter at the school board meeting because he had threatened litigation over the issue. Had he not threatened litigation, then any attempt to prevent him from speaking at the public school board meeting could have been construed to be based upon his specific viewpoint. But the undisputed evidence establishes that he was denied the opportunity to speak because he had threatened

litigation. And Plaintiffs have pointed to no cases clearly establishing that a restriction on a person's speech under these circumstances violates a person's First Amendment rights. Under these circumstances, no reasonable school official would have concluded that such a restriction violated the First Amendment. Accordingly, McCurry is entitled to qualified immunity as to this claim.

## II. Plaintiffs' State-law Claims

Plaintiffs also assert against Defendants the following state-law tort claims: (1) an invasion of privacy claim against Oates; (2) an assault/battery claim against Smith; and (3) false imprisonment claims against Veliz, Kemp, and Smith. The Court finds that Defendants are entitled to official immunity on these claims and, thus, that summary judgment should be granted as to these claims.

"[O]fficial . . . immunity offers limited protection from suit to governmental officers and employees." *Gilbert v. Richardson*, 452 S.E.2d 476, 481 (Ga. 1994). A public officer or employee may be personally liable "when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" *Id.* at 483 (quoting Ga. Const. of 1983, Art. I, Sec. II., Par. IX(d)); *see also id.* (explaining that "official functions" includes both discretionary and ministerial functions). Because it is undisputed that Defendants were

engaged in discretionary functions, Defendants are entitled to official immunity unless a reasonable jury could find that they acted with actual malice. "'"Actual malice" requires a deliberate intention to do wrong.'" *Brand v. Casal*, --F.3d--, 2017 WL 6461965, at *3 (11th Cir. 2017) (quoting *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996)). Plaintiffs failed to point to any evidence from which a reasonable jury could conclude that Defendants acted with actual malice. Accordingly, Defendants are entitled to summary judgment on all of Plaintiffs' state-law claims.

## CONCLUSION

Defendant Smith's motion for summary judgment (ECF No. 17) is granted, and Defendants McCurry, Veliz, Oates, and Kemp's motion for summary judgment (ECF No. 19) is also granted. Because Plaintiffs abandoned their claims against McCurry in his official capacity, this Order disposes of all of Plaintiff's claims, and the Clerk is directed to enter final judgment in favor of Defendants and against the Plaintiffs.

IT IS SO ORDERED, this 22nd day of December, 2017.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA